NOT FOR PUBLICATION                                    [Dkt. No. 39]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| NANTICOKE LENNI-LENAPE TRIBAL NATION, | |
| Plaintiff, | Civil No. 15-5645 (RMB/JS) |
| v. | **OPINION** |
| ROBERT LOUGY, ACTING ATTORNEY GENERAL OF NEW JERSEY IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, | |
| Defendant. | |

APPEARANCES:

**Frank L. Corrado**
Barry, Corrado, Grassi & Gibson, P.C.
2700 Pacific Ave.
Wildwood, NJ 08620
     *Attorney for Plaintiff*

**Stuart Mark Feinblatt**
**Kimberly Ann Han**
**Laura Mastriano Console**
Office of the Attorney General
Hughes Justice Complex
25 W. Market St.
Trenton, NJ 08625
     *Attorney for Defendant*

**BUMB**, United States District Judge:

     This matter comes before the Court upon a motion to dismiss

filed by Defendant Acting Attorney General of New Jersey Robert

Lougy (the "Defendant"), who is sued in both his individual and

official capacities.  Second Amended Complaint ("Second Amended Complaint" or "SAC") [Dkt. No. 37].  Plaintiff in the above-captioned matter is the Nanticoke Lenni-Lenape Tribal Nation (the "Plaintiff" or the "Tribe").  Plaintiff brings three constitutional claims seeking relief as a result of the Defendant's alleged conduct regarding the Plaintiff's state recognition as a tribe of American Indians.  Id. ¶¶ 56-72.  For the reasons set forth below, Defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART.**

I.   **FACTUAL BACKGROUND**[1]

  A. **The Nanticoke Lenni-Lenape**

     Plaintiff is "a constitutionally organized, self-governing, inherently sovereign American Indian tribe," most of whose members reside in the state of New Jersey.  SAC ¶ 2.  The Tribe trace their heritage back to the Lenni-Lenape tribe, (also called the Delawares), some of whom lived in the area that subsequently entered the United States as New Jersey.  Id. ¶ 10.  That heritage dates back over 12,000 years.  Id.  The colonization of America, particularly the resulting disease and violence, was damaging to the Lenni-Lenape people and in 1758,

---

[1] The facts recited herein are derived from Plaintiff's Second Amended Complaint.  The Court will and must accept Plaintiff's well-pled allegations as true for purposes of this motion to dismiss.  See Bistrian v. Levi, 696 F.3d 352, 358 n. 1 (3d Cir. 2012).

the Brotherton Reservation was established by the colonies in present-day Burlington County.  Id. ¶ 11.  The emerging independence struggle in the colonies also resulted in a recognition by the colonists that the Lenni-Lenape could be a powerful ally in the fight against the British.  As such, the first treaty signed by the government after the signing of the Declaration of Independence was with the Lenni-Lenape.  Id. ¶ 12.

As the Second Amended Complaint alleges, in 1802, the Brotherton Reservation was disbanded, and New Jersey began pushing out the Lenni-Lenape.  Id. ¶ 13.  Some members of the Lenni-Lenape avoided removal and maintained a presence in their homeland, which had subsequently become New Jersey.  Id. ¶ 14. As Plaintiff states, the Nanticoke Lenni-Lenape "includes persons whose ancestors were Lenni-Lenape who remained in New Jersey and the Nanticoke, a documented tribe that resided in the Chesapeake Bay side of the Delmarva Peninsula.  Many of [Plaintiff's] families have lived for hundreds of years in what is now Fairfield Township, New Jersey, where the Tribe maintains tribal grounds, called 'Cohanzick,' housing a community center, ceremonial grounds, and a store."  Id. at ¶ 14.

During its history, the Nanticoke Lenni-Lenape tribe has encountered prejudice in American society.  American Indians were not considered "persons within the meaning of the law"

3

until 1924.  Id. ¶ 15.  According to the Second Amended
Complaint, beginning in the late 1800's and running until the
1980's, New Jersey "pursued an official practice of
administrative racial reassignment."  Id. ¶ 16.  "Public
officials altered the race indicated on birth certificates of
American Indian infants to either white or black in an attempt
to eliminate American Indian racial identity.  This 'racial
purity' practice by the state injured New Jersey's American
Indian tribes in profound ways, including socially,
economically, and politically."  Id.

### B. Purported State Recognition

According to the Second Amended Complaint, in the late
1970's and early 1980's, New Jersey shifted toward a policy of
"state recognition" of American Indian tribes.  Id. at ¶ 21.
"Over the course of several decades, New Jersey recognized and
reaffirmed recognition of three American Indian tribes dozens of
times in a multitude of ways[.]"  Id. at ¶ 22.  Among the ways
New Jersey is alleged to have recognized tribes are New Jersey's
passing of concurrent resolutions of the state legislature, New
Jersey's passing of statutes granting certain rights to tribes,
the creation of an official Commission on American Indian
Affairs comprised of members of specifically named tribes, and a
record of acknowledging recognition in regular state business.
Id.

In 1982, after having previously passed concurrent resolutions recognizing two other American Indian tribes, the Ramapough Mountain Indians and the Powhatan Renape Nation, the New Jersey State Legislature also passed a concurrent resolution recognizing the Nanticoke Lenni-Lenape. Id. at ¶¶ 27-28.  Prior to passing the concurrent resolution (the "Concurrent Resolution") recognizing the Nanticoke Lenni-Lenape, the legislature "requested, received and examined tribal genealogical records, evidence of self-governance, and testimony of tribal representatives."  Id. at ¶ 28.  The title of the Concurrent Resolution is: "A Concurrent Resolution designating the [Tribe] as such and memorializing the Congress of the United States to acknowledge the [Tribe] in order to qualify the [Tribe] for appropriate federal funding for Indians."  Id.

In the time after the passage of the Concurrent Resolution, Former New Jersey Attorney General Cary Edwards, who led the effort to adopt the Ramapough resolution in the legislature, prepared a sworn affidavit about his efforts in the New Jersey legislature.  Without divulging the contents of the affidavit, the Second Amended Complaint states that the affidavit "attests to the lengths to which he and others went to ensure that all legislators and other relevant parties in state government knew the intended purpose of the [Concurrent Resolution] was to convey state recognition."  Id. at ¶ 37.

As the Second Amended Complaint sets forth, the importance of state recognition to the Tribe is paramount.  "Since 1982, the Tribe has reasonably relied on New Jersey's recognition to claim eligibility for, and entitlement to, certain federal benefits, and to obtain them.  The Tribe and its members have expended time, money, and energy in reliance on the state's recognition.  The tribe has also, to a significant degree, associated its tribal identity with that recognition."  Id. at ¶ 32.[2]

In the years following the Concurrent Resolution, New Jersey often passed legislation that referred to the same three tribes (Plaintiff, the Ramapough Mountain Indians, and the Powhatan Renape Nation).  For instance, in 1992, New Jersey enacted N.J.S.A. 26:8-49, a statute entitled "Correcting birth and fetal death certificates; members of certain American Indian tribes."  (N.J.S.A. 26:8-49.)  With regard to any person seeking

_____

[2] The Second Amended Complaint also sets forth the distinction between state and federal recognition.  As it alleges, "The federal government, for the purposes of providing access to certain of its programs, does not require states to adopt a particular process for state recognition or that the state's process adhere to a level of formality that might be required by the state in other policy-making circumstances."  SAC ¶ 32.  The Second Amended Complaint goes on, "The federal government adopts this flexibility for valid public policy reasons.  Because obtaining services through federal recognition is unrealistic for some tribes, accepting multiple methods of state recognition makes it more likely that critical services will get to those tribes."  Id. ¶ 33.

to correct his or her birth report, "Corrections may [] be signed by any person whose birth report is in error provided substantiating documentary proof, satisfactory to the State registrar or any local registrar, is submitted therewith and noted by said State registrar or local registrar upon the written request for correction." Id. However, with regard to any person who is a member of the "three New Jersey tribes of American Indians," an additional mechanism was made available by the statute to allow for correction. Specifically, N.J.S.A. 26:8-49 states:

> In the case of a correction to the birth record of a member of **one of the three New Jersey tribes of American Indians**, the Powhatan-Renape Nation, the Ramapough Mountain Indians, or the **Nanticoke Lenni-Lenape Indians**, the substantiating documentary proof may include, but shall not be limited to, an affidavit, satisfactory to the State registrar or any local registrar and signed by the *chief of the tribe* that according to tribal records the person whose certificate is to be amended is a member of the tribe of the chief whose signature appears on the affidavit.

N.J.S.A. 26:8-49 (emphasis added). The Assembly Health and Human Services Committee Statement associated with that statute reads:

> American Indians are frequently issued birth certificates indicating an incorrect race, and often encounter difficulties in obtaining evidence satisfactory to the State registrar of vital statistics or to local registrars to support their claims that their birth certificates should be amended. *This bill would specifically allow **a chief of one of the three New Jersey tribes, the Powhatan-Renape Nation, the Ramapough Mountain Indians, and the Nanticoke-Lenni-Lenape***

> ***Indians,*** *to submit affidavits concerning tribal records which could be used as proof of membership in the chief's tribe.*

Assembly Health and Human Services Committee Statement, Assembly, No. 999-L.1991, c. 359 (emphasis added).

Other state business is also alleged to have acted as an affirmation of state recognition.  In September 1992, the Second Amended Complaint alleges that the Office of Governor James Florio sent correspondence to the Indian Arts & Crafts Board, which regulates the usage of the "Indian Made" label which can be affixed to goods manufactured by the state or federally recognized American Indian tribes.  In that correspondence, the Office of the Governor stated:

> Governor Florio has asked me to respond to your recent letter about the state of state-recognized Indian tribes in New Jersey.  The New Jersey State Legislature, comprised of the Senate and Assembly, is the law-making body that is responsible for the legal recognition of Indian tribes.  Formal recognition is accomplished by State Resolutions, which remain in effect until rescinded.  ***To date, three tribes have been recognized.***

SAC ¶ 30(c).

Three years later, in 1995, during the administration of Governor Christine Todd Whitman, New Jersey formed the Commission on American Indian Affairs.  Id. ¶ 30(d); N.J.S.A. 52:16A-53.  That Commission "services as the liaison among the governments of the tribes, New Jersey, and the United States." The Commission is comprised of nine members.  N.J.S.A. 56:16A-

53.  "The Secretary of State, serving ex officio, and eight public members, not more than four of whom shall be from the same political party.  Two of the public members shall be members of the Nanticoke Lenni[-]Lenape Indians, to be appointed by the Governor on the recommendation of the Confederation of the Nanticoke Lenni[-]Lenape Tribes and with the advice and consent of the Senate."  Id.  According to the statute, two other members were to come from the Ramapough Mountain Indians and two from the Powhatan Renape Nation.  Finally, two members were to be comprised of "Intertribal People," who were defined as "American Indians who reside in New Jersey and are not members of the Nanticoke Lenni[-]Lenape Indians, the Ramapough Mountain Indians, or the Powhatan Renape Nation, *but are enrolled members of another tribe recognized by another state or the federal the federal government.*"  Id. (emphasis added).

In a letter in February 2000, the Office of New Jersey's Secretary of State stated:

> The Department [of State] has confirmed, upon inquiry, that the State of New Jersey has recognized three groups of Indians.  They are referred to in the law as the Nanticoke Lenni-Lenape Indians, the Ramapough Mountain Indians, and the Powhatan Renape Nation.

SAC ¶ 30(e).  Also in 2000, the U.S. Census Bureau confirmed the designation of the Nanticoke Lenni-Lenape in a letter to the state Commission on American Indian Affairs, stating "Our records show that the state of New Jersey has granted

recognition to . . . tribal governments." Id. ¶ 30(f).  In
November 2000, the Commission on American Indian Affairs
formally reported to the governor and legislature, stating:
"**There are only three tribes in the state of new Jersey that are
legally recognized by the state.**" Id. ¶ 30(g) (emphasis added).

In 2001, the Second Amended Complaint alleges that "a
private citizen claiming to represent his own newly constituted
tribe sued the state seeking to acquire lands in the geographic
area of the former Brotherton Reservation." Id. ¶ 30(h).  "The
state defended itself, in part, by asserting that the citizen
was not affiliated with one of its three existing tribes.  The
Tribe simultaneously sued the citizen to prevent him from
implying any association with it, and prevailed." Id.  In 2000
and 2001, "multiple federal governmental environmental
assessments prepared in consultation with the state in advance
of improvements at McGuire Air Force Base confirmed that the
Tribe is state-recognized." Id. at 30(i).

In March 2003, U.S. Senator John Corzine wrote a letter to
the U.S. Department of the Interior which stated:

> The Nanticoke Lenni-Lenape have been functioning as a
> designated tribe in New Jersey since a concurrent
> resolution passed the New Jersey Legislature to
> designate them as such in 1982.  As a result, the
> Nanticoke Lenni-Lenape has received grants and services
> from federal programs for [state-recognized] Indians.

Id. ¶ 30(k) (alteration in original).

10

From 2002 through 2005, the Second Amended Complaint alleges, the Tribe sued a municipality in New Jersey which challenged the validity of New Jersey's statewide historic preservation process.  After the Tribe prevailed, formal ceremonies at the state capital included the presentation by the governor of the Governor's Award for Historic Preservation, which "validated [the Nanticoke Lenni-Lenape's] state-recognized status by demonstrating its commitment to the interests of all residents of New Jersey."  Id. ¶ 30(j).

**C. State Recognition Deteriorates**

Effective January 8, 2002, New Jersey amended the law governing its Commission on American Indian Affairs, which as noted above, included six members pulled equally from the Nanticoke Lenni-Lenape Tribal Nation, the Powhatan Renape Nation, and the Ramapough Mountain Indians.  The amendment required of the Commission an additional duty:

> [The Commission shall,] when requested by the Governor, assist the Legislature and Governor to investigate the authenticity of any organization, tribe nation or other group seeking official recognition by the State as an American Indian tribe and submit a report of its findings to the Legislature and Governor within 180 days of the completion of an investigation.  Nothing in this subsection shall be construed as authorizing the commission to recognize the authenticity of any organization, tribe, nation or other group as an American Indian tribe, which recognition shall require specific statutory authorization, nor shall this subsection be construed as in any way limiting the scope of information that may be considered in determining whether to grant such statutory recognition.

N.J.S.A. 52:16A-56(g).[3]

In 2006, Governor Corzine created the Committee of Native American Community Affairs "to research and report on the social and economic conditions of New Jersey's state-recognized American Indian tribes and other American Indian communities." Id. ¶ 30(l).  In December of 2007, that committee issued a report identifying conditions of unfair treatment in various areas including civil rights, education and employment in New Jersey.  Id. ¶ 30(m).  "The Committee's report observed that the state's prior recognition of three tribes was legally

---

[3] A conditional veto message from then-Acting Governor Donald DiFrancesco appears to have requested the insertion of the final sentence of N.J.S.A. 52:16A-56(g) concerning the inability of the Commission to recognize American Indian tribes on behalf of New Jersey.  That message reads, in part,

> I am concerned, however, that expanding the role of the Commission to include the investigation of the authenticity of groups seeking official recognition by the State as an American Indian tribe may be erroneously construed as establishing a mechanism to confer state recognition . . . which method does not presently exist in New Jersey.  The official recognition of groups as an Indian tribe is generally better left to the federal Bureau of Indian Affairs, which already has a well-established procedure for the recognition of Indian tribes . . . .  Therefore, I recommend that a provision be included to clarify that nothing in the bill shall be construed as authorizing the Commission to recognize the authenticity of any organization, tribe, nation, or other group as an American Indian tribe, and that such recognition would require specific statutory authorization.

Governor's Conditional Veto Message, Assembly Bill No. 1957—L.2001, c.417.

sufficient.  However, it was proving politically insufficient, because over time members of the state bureaucracy had begun to undermine the tribes' status out of confusion and prejudice.  It recommended that further steps be taken to reaffirm the tribes' recognition, with options including refreshed concurrent resolutions, an executive order, or legislation."  Id. ¶ 30(n).  The report specifically found:

> Concurrent New Jersey legislative resolutions passed in 1980 and 1982 recognized three New Jersey Native American tribes — the Nanticoke Lenni-Lenape, the Powhatan Renape, and the Ramapough Lenape [sic] . . . . [The Committee] determined that the 1980 and 1983 concurrent resolutions did recognize the three New Jersey American Indian tribes . . . .
>
> New state action might be taken to further "affirm state recognition for [the] three tribes previously recognized . . . ," even if such legislation was not required.

Id. ¶ 30(n) (emphasis omitted) (alterations in original).

Thereafter, several proposals were put before the New Jersey State Legislature to, in the Second Amended Complaint's language, "reaffirm" and further clarify the three tribes' existing recognition via additional state statutes.  It is alleged these options were put forward not as an acknowledgment of a deficient recognition of the tribes, "but in acknowledgement of the political reality that casino gaming interests were seeking to undermine the tribes' status motivated by a race-based stereotype and a failure to understand that state recognition is not a pathway to federal gaming rights."

13

Id. ¶ 37.  According to Plaintiff, the legislative proposals aimed to assure certain state legislators — through their legislative history and specific language — "that the tribes had no interest in gaming."[4]  Id.

The alleged erosion of Plaintiff's state-recognized status appears to have come to a head in 2011.  At that time, the United States General Accounting Office (the "GAO") contacted the New Jersey Commission on Indian Affairs as part of a national study and was told by a staff member of the Commission – who the Second Amended Complaint alleges was not authorized to speak for the Commission – that New Jersey did not recognize any American Indian tribes.  Id. ¶ 38.  The Second Amended Complaint alleges on information and belief that the Commission staffer in denying the existence of any state recognition "relied upon counsel from the Acting Attorney General."  SAC at ¶ 38.  A year later, Commissioners were taken aback when they learned of New Jersey's apparent lack of recognition of any tribes in the published GAO report.  Id. ¶ 38.  Comments by the United States Department of Health and Human Services on the draft GAO report

---

[4] According to the Second Amended Complaint, the Tribe has no interest in gaming and is, indeed, "deeply and publicly opposed to gaming."  In fact, the three New Jersey tribes are "parties to a pact prohibiting economic benefit from gaming and have offered to have proscriptions written into law if such assurances meant the state would cease undermining their status."  Id. at ¶ 48.

indicate that the Department had not been told of New Jersey's lack of any state recognition prior to the GAO report.  Id. ¶ 39.  Furthermore, the Administration for Children and Families ("ACF") "notes that at no time was information provided to ACF by New Jersey . . . or any other Federal or State entity, that would call into question the eligibility of the tribes."  Id.

Following the nascent confusion over Plaintiff's state-recognition, the Tribe sought answers from the Attorney General's Office.[5]  "The Acting Attorney General's Chief of Staff took up the matter and liaised between the Tribe, the Attorney General's Office, and the Office of the Governor."  Id. ¶ 40. As a part of the Attorney General Office's handling of the matter, the Tribe was asked by the Attorney General's Office to provide multiple detailed explanations as to why state recognition does not provide a pathway to federal gaming rights, along with promises that the tribe did not intend to pursue any gaming.  Id.  The Second Amended Complaint alleges that after the Acting Attorney General concluded investigating the issue, the Chief of Staff suggested to the Acting Attorney General that he "issue a formal written retraction of prior statements from

---

[5] Defendant was not the Acting Attorney General during this series of correspondence, as the procedural posture of this case indicates.  Complaint [Dkt. No. 1] (naming Acting Attorney General Hoffman as defendant prior to Mr. Lougy assuming the post and being named defendant in the SAC).

his office questioning the state recognition of the tribes."
Id. ¶ 40.  Multiple drafts of such a letter were circulated
between the parties.  Id.

The Second Amended Complaint alleges that after months of
awaiting a final signature on a letter retracting his stance on
state recognition, "the Tribe was informed that certain
political crises had caused the attention of the Acting Attorney
General to shift and that he would take no voluntary steps to
stanch or reverse the damage being caused by his attempt without
due process to undo state recognition of these tribes."  Id. at
¶ 41.

### D. <u>Subsequent Inconsistencies in State Recognition</u>

Despite the Attorney General Office's ultimate decision to
refrain from retracting its previous advice to the Commission-
member that the Nanticoke Lenni-Lenape are not a state-
recognized tribe, some state agencies in New Jersey nonetheless
continued to act as if the Tribe was indeed recognized.  For
instance in 2014, the New Jersey Department of Children and
Families reported to the United States Department of Health and
Human Services that "New Jersey has . . . three State-recognized
tribes[.]"  Id. ¶ 42(a).  The Department of Children and
Families reaffirmed this notion in its June 2015 Annual Progress
and Services Report.  Id. ¶ 42(b).

Due to its representation to the federal government in some instances that it has three state-recognized tribes, New Jersey has also been able to take advantage of some federal benefits. For instance, New Jersey has several designated HUBZones, short for historically underutilized business zones.  Id. ¶ 42(c). The HUBZone program, which is managed by the federal government, establishes preferences for federal contracts to small business located in designated areas.  "Due to New Jersey's representations to the Census Bureau that it has state-recognized tribes . . . , New Jersey maintains its ability to provide access to these preferences to its non-tribal communities that are proximate to the tribes.  New Jersey continues to leverage the Tribe's lands in Cumberland County in this manner."  Id. ¶ 42(c).

The Second Amended Complaint additionally alleges that in securing a five-year, $4.1 million grant from the U.S. Centers for Disease Control and Prevention, "the state listed the Tribe as a partner, through which partnership the Tribe received a $100,000 state grant to address diabetes."  Id. ¶ 42(d). Finally, the Second Amended Complaint alleges on information and belief that New Jersey agencies "continue to leverage its three tribes' recognized status to benefit from tourism monies when promoting the tribes' well-attended pow wows and visits to the

17

tribes' cultural and religious sites, including the Black Creek Site." Id. ¶ 42(e).

**E. Second Amended Complaint and Alleged Injury**

On May 6, 2016, Plaintiff filed the Second Amended Complaint, bringing three causes of action: (1) Violation of Plaintiff's right to procedural due process under the United States Constitution; (2) Violation of the Plaintiff's right to substantive due process under the United States Constitution; and (3) Violation of the Plaintiff's right to equal protection under the United States Constitution.

As a result of the Defendant's position that New Jersey has not officially recognized any tribes, the Nanticoke Lenni-Lenape put forth several alleged injuries:

- Loss of the ability to market and sell artwork and crafts as "Indian-made" under the Indian Arts and Craft Act, 25 U.S.C. §§ 305 et seq., costing tribal members $260,000 per year;

- Loss of more than $600,000 in grants from the Department of Health and Human Services Administration for Native Americans;

- The threatened loss of the Tribe's 8(a) entity's ability to do business as a certified tribal company, which yields approximately $650,000 per year in tribal employment and services revenue;

- Loss of educational opportunities and funding for young tribe members, as students have ceased applying scholarship support for fear of subsequently losing that support after enrollment;

- The loss of funding from the Department of Health and Human Services Office of Community Services and

>Community Service Block Grant Program, which is only available to state-recognized American Indian tribes and tribal organizations;

- The loss of access to business loans, specifically, Wells Fargo Bank initially approved the Tribe's application for a line of business credit, but recently withdrew its approval specifically citing the Acting Attorney General's actions attempting to disavow the Tribe's state recognition;

- Continuing harm from being ineligible to receive recurring grants previously secured by the tribe;

- The threatened loss of the Tribe's membership or standing in professional organizations, such as the National Congress of American Indians; and

- The loss of tribal identity and prestige.

Id. ¶ 53.

The Plaintiff seeks several forms of relief, including declaratory relief, injunctive relief, and costs and fees pursuant to 42 U.S.C. § 1988.

## II.  **LEGAL STANDARD**

### **Federal Rule of Civil Procedure 12(b)(6)**

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

19

draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id. at 662.  "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss.  Id. at 678.  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

In reviewing a plaintiff's allegations, the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff."  Bistrian v. Levi, 696 F.3d 352 n.1 (3d Cir. 2012). Only the allegations in the complaint, and "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case" are taken into consideration.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing Chester Cnty. Intermediate Unit v. Penn. Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990)).

The standard of review for a facial challenge to jurisdiction under Rule 12(b)(1) – as Defendant brings – is the same as under Rule 12(b)(6).  Constitution Party of Penn. v.

<u>Aichele</u>, 757 F.3d 347, 358 (3d Cir. 2014).  This Court must presume that Plaintiff's well-pleaded factual allegations are true.  <u>Petruska v. Gannon Univ.</u>, 462 F.3d 294, 299 (3d Cir. 2006).  The Court views these allegations in the light most favorable to Plaintiff.  <u>Constitution Party</u>, 757 F.3d at 358.

**III. <u>ANALYSIS</u>**

Defendant moves to dismiss on several grounds, including pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defendant's first contentions are threshold ones: that the suit is barred by sovereign immunity and that the case presents a non-justiciable political question.  Def.'s Br. at 14-18; <u>id.</u> at 24-29.  Defendant also contends that Plaintiff has failed to state a claim for: violation of its procedural due process rights, <u>id.</u> at 35-37; violation of its substantive due process rights, <u>id.</u> 30-35; and violation of its equal protection rights, <u>id</u>. at 37-40.  The Court addresses these contentions in turn below.

**A. <u>Sovereign Immunity</u>**

Defendant's first contention is that this case should be dismissed under the Eleventh Amendment's sovereign immunity protection.  The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens

or subjects of any Foreign State." U.S. Const. amend XI. As
the Supreme Court of the United States has explained, "[T]he
States' immunity from suit is a fundamental aspect of the
sovereignty which the States enjoyed before the ratification of
the Constitution, and which they retain today . . . ." Alden v.
Maine, 527 U.S. 706, 713 (1999). "The preeminent purpose of
[sovereign immunity] is to accord States the dignity that is
consistent with their status as sovereign entities." Fed.
Maritime Comm'n v. South Carolina State Ports Auth., 535 U.S.
743, 760 (2002). As such, the Eleventh Amendment is ordinarily
a bar to suits against unconsenting states by citizens, along
with suits against state officers sued in their official
capacity. Edelman v. Jordan, 415 U.S. 651, 662-663 (1974)
("When the action is in essence one for the recovery of money
from the state, the state is the real, substantial party in
interest and is entitled to invoke its sovereign immunity from
suit even though individual officials are nominal defendants").

Sovereign immunity, however, does not apply in all cases at
all times. Koslow v. Commonwealth of Pennsylvania, 302 F.3d
161, 168 (3d Cir. 2002) ("[A] state's Eleventh Amendment
protection from federal suits — whether brought by citizens of
their state or anther — is not absolute"). For instance, "[a]
person seeking purely prospective relief against state officials
for ongoing violations of federal law may sue under the 'legal

22

fiction' of <u>Ex parte Young</u>."  <u>Ex Parte Young</u>, 209 U.S. 123 (1908); <u>MCI Telecomm. Corp. v. Bell Atlantic Penn.</u>, 271 F.3d 491, 506 (3d Cir. 2001) ("The relief sought may be prospective, declaratory or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages."). "The theory behind <u>Young</u> is that a suit to halt the enforcement of a state law in conflict with the federal constitution is an action against the individual officer charged with that enforcement and ceases to be an action against the state to which sovereign immunity extends; the officer is stripped of his official or representative character and becomes subject to the consequences of his individual conduct." <u>Penn. Fed'n of Sportsmen's Clubs, Inc. v. Hess</u>, 297 F.3d 310, 323 (3d Cir. 2002) (quoting <u>MCI</u>, 271 F.3d at 503).  However, "<u>Young</u> does not apply if, although the action is nominally against individual officers, the state is the real, substantial party in interest and the suit in fact is against the state."  <u>Id.</u>

In this case, the relief sought by Plaintiff can fairly be characterized as prospective in nature.  Plaintiff seeks declaratory relief that it has been recognized as an American Indian tribe by the State of New Jersey, as well as declarations that Defendant's actions violated Plaintiff's substantive due process rights, all with the purpose of enjoining Defendant from "denying, repudiating, or otherwise impairing the Tribe's status

as an American Indian tribe . . . ."  SAC p. 25.  The relief
sought is within the confines of "prospective, declaratory [and]
injunctive" and is targeted at the specific conduct of the
Defendant.

Based on the allegations in the Second Amended Complaint
and the relief requested, this is not a suit where the ultimate
result sought is to achieve some sort of recompense from the
state, but is rather for the discrete purpose of preventing the
Defendant from repudiating a status to which the Plaintiff
claims entitlement.  Assuming, <u>arguendo</u>, that the Tribe has been
recognized by the state, the Defendant's conduct in disavowing
that recognition could amount to an ongoing constitutional
violation.  This is what <u>Young</u> asks.  <u>N.J. Educ. Ass'n v. New
Jersey</u>, 2012 WL 715284, at *3 (D.N.J. Mar. 5, 2012)
("Prospective relief . . . includes relief that bars a state
actor from engaging in certain unconstitutional acts or abates
ongoing constitutional violations.").  Plaintiff seeks a
declaration that the Defendant's conduct violated their
constitutional rights and an injunction preventing this from
occurring going forward; "[t]his is the paradigmatic <u>Young</u>
framework."  <u>MCI Telecomm.</u>, 271 F.3d at 514.

In that light, it is clear that the state is not the real
party in interest in this case, but rather the Defendant is.  As
Plaintiff rightly points out, that the relief they seek "may

24

affect state policies and procedures is an inevitable consequence of any lawsuit challenging unconstitutional action by a state officer."  Pl.'s Br. at 11 (citing Couer D'Alene, 521 U.S. at 269).  Plaintiff does not ask this Court to compel New Jersey to recognize the Tribe, nor do they seek to be reimbursed for any losses that have come about from the cloud that has been placed over their status by the conduct of the Defendant.  See Hogg's v. New Jersey, 352 Fed. Appx. 625, 628 (3d Cir. 2009) (holding that law suits that would be paid out of the state treasury functionally name the state as the real party in interest).  Under that lens, with an eye toward the relief sought by Plaintiff, New Jersey is not the real party in interest.  As such, Defendant's motion to dismiss on sovereign immunity grounds is DENIED.[6]

### B. **Political Question Doctrine**

Defendant also argues that the political question doctrine bars this suit.  "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for

---

[6] Plaintiff makes very few allegations of personal conduct by the Defendant, but rather the allegations largely concern the individual actions of predecessors to his office.  As Defendant correctly notes, such allegations are insufficient to sustain individual capacity causes of action.  (Def.'s Br. at 30 n.11.) at As such, Defendant's motion to dismiss Plaintiff's individual capacity portion of the suit is GRANTED.

resolution to the halls of Congress or the confines of the Executive Branch." Gross v. German Foundation Induc. Initiative, 456 F.3d 363, 377 (3d Cir. 2006) (quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)). The doctrine is equally applicable to judicial review of potential political questions involving state government. See generally Gilligan v. Morgan, 413 U.S. 1 (1973) (applying political question doctrine in suit involving state officers). The contours of the doctrine — which form six factors – are outlined by the oft-cited Supreme Court case addressing the doctrine, Baker v. Carr, 369 U.S. 186 (1962):

> Prominent on the surface of any case held to involve a political question is found[: (1)] a textually demonstrable commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it; or [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217.  As the Baker Court noted, unless one of those formulations of the political question doctrine is inseparable from the case itself, there should be no dismissal on political question grounds.  Id.  On the other hand, "[a] finding of any one of the six factors indicates the presence of a political

26

question." <u>Gross</u>, 456 F.3d at 377.  Whether the mere presence
of a factor gives rise to a finding of non-justiciability,
however, becomes a question of whether the factor is
"inextricable from the case at bar." <u>Id.</u> (quoting <u>Baker</u>, 369
U.S. at 217).  Cases dealing with potential non-justiciable
political questions are resistant to any form of "semantic
cataloguing" and the inquiry into this doctrine is inherently
fact-specific.  <u>Id.</u>

Defendant's argument misses the mark with regard to each
<u>Baker</u> factor purportedly implicated, but also misses the mark in
how he frames the analysis.  Defendant opens his argument by
framing the "state of affairs" as a world in which the New
Jersey legislature has never recognized the Nanticoke Lenni-
Lenape as a tribe and has, indeed, expressly refused to do so.
Def.'s Br. at 27.  This "state of affairs" also includes a world
in which such action can only be done by express action pursuant
to N.J.S.A. 52:16A-56(g).  Def's Br. at 26.  At the motion to
dismiss stage, when the well-pled allegations in the Second
Amended Complaint are assumed true, the Court is unpersuaded by
Defendant's worldview.  The Second Amended Complaint sets forth
facts sufficient to show the legislature did indeed recognize
the Tribe, at the very least by implication, in several
statutes.  The Court reaches that determination, saying nothing
of the 1982 Concurrent Resolution which explicitly recognized

27

the Nanticoke Lenni-Lenape for purposes of receiving federal benefits – which are at the heart of the relief sought in this case.  Defendant has argued that, despite the extensive genealogical research that went into it, the Concurrent Resolution was a feckless nicety by the New Jersey legislature which cannot serve any legal purpose.  The Court need not reach that argument at this stage, when the statutes themselves, which grant rights and privileges to the "New Jersey tribes" – a descriptor that includes Plaintiff – are sufficient to withstand a motion to dismiss when viewed in the light most favorable to the Plaintiff.

Turning to Defendant's arguments on the Baker factors themselves, Defendant first argues there is a lack of judicially manageable standards for resolving the issue because Plaintiff has cited no statutory or regulatory standards allowing for recognition of American Indian tribes in New Jersey, nor is there purportedly a duty to create such standards.  Def.'s Br. at 27.  It is certainly true that the mechanism by which state recognition might occur in New Jersey was not clearly articulated prior to N.J.S.A. 52:16A-56(g).  And, furthermore, this Court cannot identify an obligation for a state to have such standards.  However, as has been noted, "[s]tate recognition has a long history, enjoying several centuries of precedent and evolution."  Alexa Koenig & Jonathan Stein,

<u>Federalism and the State Recognition of Native American Tribes</u>, 48 Santa Clara L. Rev. 79, 86 (2008).[7]  While the notion of whether the Tribe ought to be recognized might fall into the realm of political question, that issue is not the central one to this case.  It is easily extricated from the issue of whether the Defendant's directive violates the Tribe's constitutional rights.  Put differently, the issue is whether the Defendant violated Plaintiff's constitutional rights when he renounced a former state recognition, specifically a recognition that was treated as such by:

- The New Jersey state legislature, <u>see</u> SAC ¶ 30(a), (b), (d);

- Several different New Jersey Governor's administrations, <u>see</u> <u>id.</u> ¶ 30(c), (d), (f), (j);

- New Jersey state agencies, <u>see</u> <u>id.</u> ¶ 30(e), (g), (h), (l)-(n), (o);

---

[7] Of note, the cited law review article discusses the recognition status of the Nanticoke Lenni-Lenape Tribal Nation.  That article states, "According to a number of sources, New Jersey potentially recognizes three state tribes, including the Nanticoke Lenni-Lenape, Powhatan Renape Nation and Ramapough Mountain Indians.  New Jersey primarily utilizes a state law recognition process but has used a legislative recognition process in the past.  New Jersey Statute section 26:8-49 mentions the Nanticoke Lenni-Lenape, Powhatan Renape Nation and Ramapough Mountain Indians as 'the three New Jersey tribes of American Indians' in the context of a statute for correcting birth records.  New Jersey Statute section 52:16A-53 establishes the New Jersey Commission on American Indian Affairs, and notes New Jersey's three state-recognized tribes for the purpose of membership eligibility in the Commission."  <u>Id.</u>

- Federal agencies interacting with the state and at least one United States senator interacting with the U.S. Department of the Interior, see id. ¶ 30(h), (k).

At various times, New Jersey through its Governor or state agencies has reported to the Federal Government that it has recognized the Tribe.  id. ¶ 30.  Viewing those facts in the light most favorable to Plaintiff, this Court believes they have sufficiently alleged their prior status of state recognition to allow this Court to determine whether that status has been revoked by the Defendant in violation of their constitutional rights.

For similar reasons, Defendant's argument that a decision by this Court would require an initial policy determination reserved for nonjudicial discretion is also unavailing.  See Def.'s Br. at 28.  This Court is not being asked to determine for an initial policy matter whether the Tribe is a tribe of American Indians or whether New Jersey should recognize them as such, but rather whether New Jersey did historically recognize them, and whether the Defendant's alleged late-arriving and unilateral decision against the backdrop of an inquisition into the Tribe's interest in gaming rights is a violation of constitutionally guaranteed rights to due process and equal protection.[8]

_____

[8] Defendant also suggests that conduct by the New Jersey state legislature has effectively repealed or evidenced a lack of

Defendant finally argues that this Court cannot resolve the issue without expressing a lack of respect for the coordinate branches of government or creating an "embarrassment from multifarious pronouncements by various departments on one question." Def.'s Br. at 28. The Court is mindful of the fact that "disrespect" alone is insufficient under the political question doctrine. United States v. Munoz-Flores, 495 U.S. 385, 390 (1990). Moreover, the Court cannot identify any way in which respect would not be shown to the state legislature by adjudicating that the conduct of the Defendant eviscerates the alleged statutory recognition provided by the state legislature. There is no affirmative legislative action alleged in the Second Amended Complaint that is inconsistent with its pronouncements concerning the Tribe's status.

Moreover, the Court is unpersuaded that embarrassment would arise from its resolutions of this issue. See Def.'s Br. at 28. Based on the allegations of the Second Amended Complaint, the

_____

state recognition. Def.'s Br. at 28-29. Even assuming the New Jersey state legislature's failure to recognize the Tribe through proposed legislation could amount to a repealing or definitive statement that it has never recognized the Tribe, this Court must accept Plaintiff's well-pled allegation that the reason the legislature took this step was to confirm an already valid recognition under a new statutory scheme which had brought about questions concerning the validity of the Nanticoke Lenni-Lenape's state recognition status. Any evidence to the contrary in the legislative history can certainly be considered at summary judgment, if applicable.

status of Plaintiff's state recognition was largely well-settled until a conflicting resolution of the issue was put forth by the Defendant.  The Court's adjudication of whether that position shift violates a constitutional right does not implicate the embarrassment of inconsistent resolution.  To reiterate, this Court is not being asked to pass judgment on whether the Tribe is worthy of recognition.

In sum, the Court is not persuaded that the specific facts and the relief sought by Plaintiff that this case presents a non-justiciable political question.  To be sure, as Plaintiff's allegations make clear, the tribal recognition process is one mired in politics.  See, e.g., SAC ¶ 41 ("After months of awaiting the Acting Attorney General's signature on a final draft of the retraction letter, the Tribe was informed that certain political crises had caused the attention of the Acting Attorney General to shift and that he would take no voluntary steps to stanch or reverse the damage being caused.").  That said, Baker and the cases flowing from it have made clear that matters involving politics, but not inextricable political question issues, are capable of being resolved by this Court.  As such, this Court reaches the merits of Plaintiff's claims and Defendant's arguments in favor of dismissal below.

C. **Causes of Action 1 & 2: Due Process**

   i. **Procedural Due Process**

Plaintiff's first cause of action claims a violation of the Tribe's due process rights.  To state a claim under 42 U.S.C. § 1983[9] for deprivation of procedural due process rights, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"  Hill v. Borough of Kutztown, 455 F.3d 225, 233-34 (3d Cir. 2006) (citing Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).  As the Supreme Court has remarked:

> Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.  Thus, the welfare recipients in Goldberg v. Kelly [] had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them.  The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility.  But we held that they had a right to a hearing at which they might attempt to do so.

Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 578 (1972).  That said, "One alleging a property interest in a benefit protected by due process must go beyond showing an

---

[9] It does not appear contested that Plaintiff has sufficiently alleged that Defendant acted under color of state law.

unsubstantiated expectation of the benefit . . . He must, instead, have a legitimate claim of entitlement to it." Piecknick v. Com. of Pa., 36 F.3d 1250, 1256 (3d Cir. 1994) (internal citations and quotation marks omitted).

With regard to the first element, that Plaintiff was deprived of an interest protected by state law, Defendant again argues the Concurrent Resolution did not have the effect of law and therefore did not create any expectation of benefit.  The Court is unpersuaded that this line of argument controls the outcome.  Initially, the Concurrent Resolution is entitled: "A Concurrent Resolution designating the [Tribe] as such and memorializing the Congress of the United States to acknowledge the [Tribe] in order to qualify the [Tribe] for appropriate federal funding for Indians."  SAC ¶ 28; See also Koenig & Stein, supra, at § III(C)(i).  At the least, Defendant's argument accuses the New Jersey state legislature of making a profound error in their choice of vehicle for acknowledging the Tribe.

More importantly, the Court need not address the legal issue of the Concurrent Resolution's efficacy at this stage.  As set forth above, the Second Amended Complaint establishes that the New Jersey state legislature has passed multiple statutes that might create the expectation of benefit when state-recognition is alleged to be the basis by which some federal

34

benefits are conferred.  In the time since the passing of those statutes, Plaintiff has on numerous occasions been identified as, and reported to the federal government as, a state-recognized tribe.  SAC ¶ 30.  This reporting of Plaintiff as a state-recognized tribe has been the basis for which Plaintiff has claimed entitlement to, and received, benefits.  No official act pointed to by Defendant has repealed that status.  And, it is not the province of the Attorney General to unilaterally repeal it without due process.  As Plaintiff rightfully points out, New Jersey's statutory identification of the Tribe, along with its subsequent and continuous reaffirmation of that status as alleged in the Second Amended Complaint, "constitutes the 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  Pl.'s Br. at 21 (quoting Roth, 408 U.S. 577).

That leads to the question of what process would be owed before the benefit could be revoked.  Defendant argues that Plaintiff has not satisfactorily alleged what process might be due because Plaintiff has alleged only that Plaintiff was owed proper notice of the change in status or process required by law.  Def.'s Br. at 37.  Plaintiff responds that it is only required to show that "the procedures available to him did not provide 'due process of law.'"  Biliski v. Red Clay Consol School Dist., 574 F.3d 214, 220 (3d Cir. 2009); Pl.'s Br. at 22.

In this case, Plaintiff has alleged that no process whatsoever was provided prior to the loss of their property interest.  SAC ¶¶ 38, 43, 58-59; Morrisey v. Brewer, 408 U.S. 471, 481 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). On the allegations before the Court, there was an absolute lack of any process by which the Plaintiff might have contested the Defendant's decision.  Simply put, as alleged by Plaintiff, one day they were a state-recognized tribe (and had been for decades), and the next day – with the swipe of pen and an absence of due process – they were not.  On those allegations, the Court finds granting a motion to dismiss would be inappropriate.  Mathews v. Eldridge, 424 U.S. 319, 333 (1976) ("The right to be heard before being condemned to suffer a grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a basic principal to our society.").  As such, Defendant's motion to dismiss as to the procedural due process cause of action is DENIED.

###   ii.  __Substantive Due Process__

Plaintiff's second cause of action claims a violation of its substantive due process rights.  The law is clear that in order to state a claim for violation of substantive due process rights, a plaintiff must prove (1) "the particular interest at

issue is protected by the substantive due process clause" and (2) "the government's deprivation of that protected interest shocks the conscience." <u>Lear v. Zanic</u>, 524 Fed. Appx. 797, 801-802 (3d Cir. 2013).  Because the Court finds that Plaintiff has not stated a fundamental right protected by the substantive due process clause, the Court does not reach the second "shocks the conscience" element.

With regard to the first element – a particular interest protected by the substantive due process clause – the Tribe "alleges that it has a fundamental right, based on the Constitution, to exist as a distinct racial or ethnic group, free from discrimination or oppression."  Pl.'s Br. at 23 (<u>citing</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720-741 (1997) ("the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Tribe's history and tradition'").  Defendant counters that Plaintiff's "fundamental property and liberty interests 'in its identity and status as an American Indian tribe'"  Def.'s Br. at 33, is not a fundamental right or liberty protected by substantive due process.

The Court agrees with Defendant that Plaintiff has not identified a fundamental liberty interest implicated by Defendant's conduct.  While the Court is sympathetic to the harm Plaintiff alleges has befallen its members both emotionally and

37

financially, the right to be recognized by a state as a Native American tribe is not a fundamental right that has been identified in any case pointed to by Plaintiff.

Moreover, Plaintiff's argument regarding the integrity of tribe members' group relationships does not carry the day either.  Pl.'s Br. at 24.  Plaintiff argues that Roberts v. U.S. Jaycees, 468 U.S. 609, 619 (1984) establishes the fundamental right for group relationships to be free from state interference.  Id. at 619 ("The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State").  As an initial matter, Roberts upheld the application of a law that was challenged for impinging upon group interests.

Moreover, Roberts identifies two lines of cases, (1) cases concerning the "choices to enter into and maintain certain intimate human relationship"; and (2) cases concerning a "recogni[tion of] a right to associate for the purpose of engaging in those activities protected by the First Amendment[.]

Id. at 618.  Roberts ultimately stands for the proposition that small, familial groups should be afforded more protection that large, less personal ones.  Id. at 621.  That fact pattern, and the two lines of cases identified by Roberts are unrelated

38

to the current set of facts.  Defendant has not been accused of
interfering with who the Tribe may count among their own
personal membership or who may choose to enter into a
relationship within Plaintiff's ranks.  Plaintiff has not
alleged its members have been unable to associate for purposes
of exercising their First Amendment rights.  Absent another
showing or more compelling precedent, this Court is not prepared
to identify a fundamental right implicated by Defendant's
conduct.  Because this Court cannot so identify a fundamental
right, Defendant's motion to dismiss Plaintiff's substantive due
process cause of action is GRANTED.

   D. **Cause of Action 3: Equal Protection**

   Plaintiff's final cause of action alleges a violation of
its equal protection rights under the United States
constitution.  Defendant contends that this cause of action
should be dismissed because Plaintiff has not alleged that they
were treated differently from members of a similarly situated
class.  Def.'s Br. at 14 (citing Bradley v. U.S., 299 F.3d 197,
206 (3d Cir. 2002)).  Plaintiff counters that this case meets an
extension of the equal protection doctrine that has been
identified by the Second Circuit in Pyke v. Cuomo, 258 F.3d 107
(2d Cir. 2001).

   In Pyke, the Second Circuit Court held:

> A plaintiff alleging an equal protection claim . . . generally need not plead or show the disparate treatment of other similarly situated individuals  . . . So long as they allege and establish that the defendants discriminatorily refused to provide police protection because the plaintiffs are Native American, plaintiffs need not allege or establish the disparate treatment of otherwise similarly situated non-Native American individuals
>
> It would be difficult, if not impossible, to find other individuals whose situation is similar to Native Americans living on a reservation and exercising a substantial measure of self-government independent of New York State.  Plaintiffs would probably be incapable of showing similarly situated individuals who were treated differently.

Id. 108-09 (citing Brown v. Oneonta, 221 F.3d 329, 337 (2d Cir. 2000).)  Defendant does not argue that this Second Circuit authority is off point.  Instead, they argue that this Court should not adopt that persuasive authority.  Def.'s Br. at 15 ("These two cases have not been adopted in the Third Circuit and should not be followed.")

Indeed, Defendant's only affirmative argument against the reasoning set forth in Pyke is that it would be unnecessary when the Third Circuit has already adopted a "class of one" theory for equal protection claims.  That argument, however, ignores the fact that the Second Circuit, as well, has adopted such a theory in equal protection cases.  See e.g., Analytical Diagnostic labs, Inc. v. Kusel, 626 F.3d 135, 139 (2d Cir. 2010).

Of course, the precedent of the Second Circuit is not binding upon this Court.  See generally Flamini v. Valez, Civ. No. 12-7304 (RMB/JS), 2015 WL 333300, at *4 n.8 (Jan. 23, 2015) (declining to consider out of Circuit precedent).  Nevertheless, the Court will adopt the ruling in Pyke as it relates to this case.  The Court agrees with that court that the particular manner in which Native Americans – because of their unique sovereignty issues – interact with state and federal governments renders some factual predicates unique to only Native Americans and thereby outside a traditional "similarly situated" analysis under the Equal Protection Clause.  As Plaintiff points out, no other group relies upon the notion of being "recognized" by any government for purposes of obtaining benefits.

Indeed, because of Native Americans' unique societal posture, any alternative holding strikes this Court as eviscerating equal protection in the recognition process.  For instance, assuming that Defendant harbored discriminatory animus toward Native Americans solely by virtue of their race, any method by which he effected that animus in the recognition process would be entirely unchecked if not cognizable under an equal protection cause of action.  Here, Plaintiff has alleged that they were targeted for the revocation of their state recognition by Defendant because of a stereotypical belief concerning Native Americans and their gaming rights.  SAC ¶ 37.

41

Their conversations with Defendant concerning this decision appear to have irrationally focused not on whether the Defendant was proper in adopting an about-face on their state recognition, but rather on whether state recognition would give the Tribe a pathway to gaming.  Id. ¶ 40.  Viewed in the light most favorable to Plaintiff, Plaintiff has stated a cause of action for violation of its equal protection rights.

As such, Defendant's motion to dismiss Plaintiff's equal protection claim is DENIED.

**IV.   CONCLUSION**

For the reasons outlined above, Defendant's motion to dismiss on sovereign immunity or political question grounds is **DENIED**.  Defendant's motion to dismiss Plaintiff's cause of actions for violations of their procedural due process rights and equal protection rights is **DENIED.**  Defendant's motion to dismiss Plaintiff's individual capacity claims and substantive due process claim is **GRANTED.**

DATED: October 27, 2016


                              s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE